CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

3/17/2026

LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| KYLE B., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:25-cv-00176 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:   Hon. Thomas T. Cullen |
| SECURITY, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Kyle B. ("Kyle") filed suit in this court seeking to overturn the Commissioner

of Social Security's ("Commissioner") final decision denying his claim for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Kyle suffers

primarily from effects from a brain tumor and traumatic brain injury, degenerative disc disease,

major depressive disorder, intermittent explosive disorder, generalized anxiety disorder, and

post-traumatic stress disorder. After a hearing, an administrative law judge ("ALJ") concluded

that, despite his limitations, Kyle could still perform a range of light work. Kyle challenges that

conclusion, calling for reversal and remand on three primary grounds. Because the ALJ failed

to address the medical opinions regarding Kyle's mental impairments in a manner that enables

this court to review his ultimate conclusion, remand is appropriate.

## I.   STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's

final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines*

*v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, in reviewing the merits of the Commissioner's final decision, a court asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991)).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his past relevant work (if any) based on his residual functional capacity ("RFC"); and, if not (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

Kyle filed for DIB benefits on June 22, 2020. (*See* R. 529.) He claimed a disability onset date of June 16, 2020, resulting from myriad health issues: neck pain radiating into right arm; weakness and numbness in the right hand; low back pain; numbness in both legs; depression; anxiety; bipolar disorder; and post-traumatic stress disorder ("PTSD"). (*See* R. 566.) His claim was denied initially on January 14, 2021 (R. 293) and on reconsideration on July 2, 2021. (R. 119.)

After his denial, Kyle requested a hearing before an administrative law judge ("ALJ"). (R. 356.) The ALJ held that hearing on March 9, 2022 (R. 165–97) and issued a written decision denying Kyle's claim on March 15, 2022 (R. 306–25). Kyle appealed that decision, and on September 30, 2022, the Appeals Council granted his request for review, found that the ALJ's hearing decision did not "contain an adequate evaluation of the prior administrative medical

findings in assessing the claimant's residual functional capacity (RFC)," and remanded the case to the ALJ. (R. 328.) Specifically, the ALJ stated that the prior administrative medical findings were persuasive, but concluded that Kyle had an RFC with fewer limitations than those suggested by the state agency examiners. (*Id.*) Because it was uncertain whether Kyle could perform the jobs found at step five with a more restrictive RFC, the Appeals Council remanded to the ALJ to give further consideration to Kyle's maximum RFC and to "provide rationale with specific references to evidence of record in support of assessed limitations." (R. 328–29.)

After the remand, the ALJ held another hearing on October 24, 2023. (R. 198–234.) The ALJ issued a written decision again denying Kyle's claim on January 16, 2024. (R. 135–58.) Although the ALJ found that Kyle suffered from several severe impairments—specifically "brain tumor-right-sided vestibular schwannoma, traumatic brain injury-left temporoparietal subarachnoid hemorrhage lest posterior subdural hematoma, cervical and lumbar degenerative disc disease, cervical radiculopathy, cervical stenosis, and cervicalgia, major depressive disorder, bipolar, anxiety, post-traumatic amnesia, intermittent explosive disorder, [PTSD], history of sexual abuse in childhood, and substance abuse" (R. 141)—he determined that Kyle could still perform work at the light level, with additional limitations (R. 146). Kyle appealed that decision, but the Appeals Council denied his request for review, making the ALJ's written decision the final word of the Commissioner as of January 13, 2025. (*See* R. 1.)

## A.    Legal Framework

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her medical

impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work-related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"— including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he or she weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*,

873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from [that] evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by Rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023) (internal quotation omitted) (first brackets in original). *See Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B.    Medical Evidence

As noted below, the court finds that the ALJ erred in his consideration of the medical opinions regarding the effects of Kyle's mental impairments on his RFC. Accordingly, it will dispense with a detailed summary of the entire medical record. As is relevant to the present issue, however, the court will summarize evidence related to Kyle's well-documented mental-health struggles.

Prior to his disability onset date, as far back as 2019, Kyle's depression and anxiety were well documented. While incarcerated in April 2019, Kyle saw Denise Yopp, a licensed professional counselor, for an initial behavioral health evaluation. (R. 686.) Kyle reported that he was sexually assaulted by his childhood doctor when he was young and that he had seen multiple counselors throughout his life as a result. (*Id.*) He also reported that he had self-harmed and attempted suicide, and that he had been hospitalized at Catawba and Lewis Gale Hospitals. (*Id.*) Ms. Yopp reported that Kyle's mood was depressed and anxious, his thought processes were circumstantial, and his thought content was notable for auditory hallucinations. (R. 691.)

On referral from Ms. Yopp, Kyle saw Charles Novak, a certified registered nurse practitioner ("CRNP"), for an initial psychiatric evaluation. (R. 682.) CRNP Novak noted that

Kyle reported being depressed, anxious, an inability to be around others, poor concentration, and panic attacks. (*Id.*) He also noted that Kyle had previously been prescribed Lithium, Zoloft, Elavil, and Remeron, and that he started taking psychotropic medications at age four. (R. 682–83.) CRNP Novak found Kyle's mood was depressed, anxious, and irritable with questioning; his affect was flat because he "never [made] eye contact[;]"his memory was impaired and his insight and judgment were poor; and his behavior was cooperative yet withdrawn. (R. 685.) CRNP Novak's diagnoses included substance-abuse mood disorder and generalized anxiety disorder ("GAD"); he also could not rule out antisocial personality disorder. (*Id.*) He started Kyle on Effexor and Atarax. (*Id.*)

Kyle saw Ms. Yopp for a counseling session on June 14, 2019, and reported increased anxiety and irregular heartbeat. (R. 678.) Ms. Yopp noted that Kyle's thought process was circumstantial, that his insight and judgment were fair, and everything else (*i.e.* behavior, appearance, speech, mood, and affect) was appropriate, and referred Kyle for a psychiatric follow-up. (R. 676–77.) At that follow-up appointment with CRNP Novak on June 25, 2019, Kyle reported ongoing depression and anxiety. (R. 673.) CRNP Novak noted that Kyle's mood was depressed, his affect blunted, and his insight and judgment were fair. (R. 673–74.) CRNP Novak's diagnoses were unchanged, but he increased Kyle's dosage of Effexor. (R. 675.) Kyle saw CRNP Novak for follow-ups in September 2019 and January 2020; CRNP Novak's findings and diagnoses were unchanged apart from increasing Kyle's dosage of Effexor and Atarax. (R. 667–72.)

After his release, Kyle saw David Donahue, a family nurse practitioner ("FNP"), on May 27, 2020, to reestablish care. (R. 705.) Kyle's depression screening yielded a result for

moderately severe depression. (*Id.*) FNP Donahue assessed Kyle with a moderate episode of recurrent major depressive disorder, restarted Kyle on Effexor to control his mood and anger, and referred Kyle to a psychiatrist and a neurosurgeon for his cervical pain. (R. 707.)

Kyle was again incarcerated in January 2021, and on January 20, 2021, he saw Ms. Yopp for an initial mental-health assessment. (R. 750.) He reported "horrible anxiety[,]" paranoia, and panic attacks. (*Id.*) Ms. Yopp diagnosed Kyle with generalized anxiety disorder and substance use disorders and, like CRNP Novak, was unable to rule out antisocial personality disorder. (R. 754, 756.) Kyle saw CRNP Novak on two occasions in January and February 2021, and his assessments and diagnoses for Kyle largely mirrored those from 2019 and 2020. (*See* R. 746–49, 743–44.) CRNP Novak prescribed Kyle Zoloft and Remeron. (R. 749, 744.)

Kyle saw Heather Saunders, a psychiatric mental-health nurse practitioner ("PMHNP"), on May 12, 2021, to establish behavioral care. (R. 761.) Kyle's depression and anxiety screenings yielded moderate and severe results, respectively. (*Id.*) Kyle was concerned about his temper and reported screaming, "breaking everything," hitting walls and hurting his fists, and being set off by little things. (*Id.*) PMHNP Saunders reported that Kyle's affect was restricted and apathetic and that his insight and judgment were fair. (R. 764.) She diagnosed him with PTSD, major depressive disorder (MDD), and unspecified conduct disorder, and prescribed Remeron, Zoloft, and aripiprazole tablets. (R. 764–65.) Kyle reported that his symptoms improved slightly during his follow-up visit with PMHNP Saunders on June 9, 2021. (R. 770.) Kyle's diagnoses and medications remained the same apart from PMHNP Saunders increasing his dosage of aripiprazole tablets. (R. 772–73.) Kyle then saw FNP Donahue on June 18, 2021, where he was diagnosed with major depression. (R. 781.)

On January 2, 2023, Kyle was hospitalized after he was struck by a car. (R. 853.) He remained hospitalized through January 8, 2023, and his diagnoses at discharge included a diffuse traumatic brain injury, trigeminal sensory loss, PTSD, and posttraumatic amnesia. (R. 906.) Later that month, Kyle saw Dr. Darlon Jan, M.D., to establish psychiatric care. (R. 1219.) Kyle complained of cognitive changes, issues with word-finding, and OCD-like symptoms. (R. 1220.) He reported feeling irritable and depressed, impaired concentration, racing thoughts, increased risk-taking behavior, frequent worry, and unwanted images, thoughts, or urges. (R. 1220–21.) Dr. Jan's mental status examination yielded largely normal results. (R. 1226.) He diagnosed Kyle with PTSD, substance use disorders, history of traumatic brain injury, posttraumatic amnesia, intermittent explosive disorder, and history of sexual and physical abuse in childhood, and instructed him to continue taking Gabapentin, Remeron, and Zoloft. (R. 1229.) Dr. Jan noted that Kyle's accident may have caused some memory changes. (R. 1228.) Kyle saw Dr. Jan again for a follow up on February 16, 2023. (R. 1177.) Kyle reported that he was tolerating the medications, but that he was experiencing ongoing challenges with concentration. (R. 1178.) Dr. Jan found Kyle's mental status to be relatively normal, but retained his diagnoses of history of traumatic brain injury, PTSD, posttraumatic amnesia, and intermittent explosive disorder, and increased his dosages of Zoloft and Gabapentin. (R. 1183–86.)

On March 2, 2023, Kyle saw Melissa Wray, a nurse practitioner (NP), for a follow-up regarding the brain injury resulting from his accident. (R. 1260.) Kyle reported forgetfulness and poor concentration. (R. 1263.) NP Wray's examination of Kyle yielded largely normal results, including that he was able to follow multi-step commands, and advised him to follow

up with psychiatry. (R. 1264–65.) On March 16, 2023, Kyle saw Dr. Jan for a follow up and reported that his irritability was better but continued to feel frustrated and unable to concentrate. (R. 1151–52.) Dr. Jan's findings on the mental status examination were largely normal. (R. 1157.) Kyle's diagnoses were unchanged, but Dr. Jan increased his Zoloft and Gabapentin dosages and planned to conduct memory testing after Kyle's depressive symptoms improved. (R. 1160.)

## C.   Opinion Evidence

Kyle was referred by Disability Determination Service to Heather Slosman, Ph.D., for a consultative psychological examination, which took place on October 19, 2020. (R. 717.) In her report, Dr. Slosman noted that Kyle reported being easily irritated and losing his temper frequently, leading to him breaking things in fits of rage. (R. 718.) As a result, Kyle reported not having many friends and having difficulty getting along with co-workers due to his irritation. (*Id.*) She noted that Kyle is unable to sleep well at night and spends his days in bed, and while he is limited in his activities of daily living (*i.e.* he microwaves food but does not cook, and he does not clean the house), he is able to brush his teeth and shower on his own. (*Id.*) Kyle also reported that he stopped taking his medication and had not been to counseling since 2013, when he was incarcerated. (R. 719.) As for his mental status, Dr. Slosman reported that Kyle's "appearance, speech, and behavior were within normal limits[;]" he maintained appropriate eye contact throughout the evaluation; his "thought content and thought processes were within normal limits[;]" his memory and recall abilities were intact; he was alert and oriented; and his judgment appeared good. (R. 719–20.) Kyle reported that he had suicidal and homicidal ideations in the past, though it had been several years since he had the former

and several months since the latter; and that he experienced hallucinations but no delusions, obsessions, phobias, or preoccupations. (*Id.*) Based on these findings, Dr. Slosman diagnosed Kyle with generalized anxiety disorder and intermittent explosive disorder and found that it is unlikely that his mood symptoms would improve without treatment. (R. 720.) Dr. Slosman concluded that

> in regard to emotional fitness it appears that [Kyle] could engage in simple repetitive tasks. It is unlikely he could engage in detailed, complex tasks at this time. His ability to maintain regular attendance in the workplace and thus perform work activities on a consistent basis would likely be negatively impacted by his diagnosis of Intermittent Explosive Disorder and GAD. [Kyle] likely struggles to appropriately take instruction from supervisors and likely struggles to get along with peers/coworkers and the public. It is likely that the usual stresses encountered in competitive work would be difficult for him to manage at this time.

(R. 721.)

On initial review of Kyle's DIB application, state agency examiners Bert Spetzler, M.D., and Richard Luck, Ph.D., found that Kyle suffered several severe impairments—specifically disorders of muscle, ligament, and fascia; anxiety and obsessive-compulsive disorders; substance addiction disorders; and depressive, bipolar, and related disorders. (R. 281.) Dr. Spetzler noted that Kyle was able to rise from the waiting-room chair independently, sits comfortably, takes off his shirt and socks without assistance, was able to walk on toes and heels, has a non-antalgic gait, and his strength was 5/5. (R. 286.) Based on these findings, Dr. Spetzler opined that Kyle had the RFC to perform "medium" work with some postural limitations, such as frequently climbing, balancing, stooping, kneeling, crouching, or crawling; however, he imposed no manipulative, visual, communicative, and environmental limitations.

(R. 284–85.) Dr. Spetzler found that Kyle was able to stand, walk, and sit for "[a]bout 6 hours in an 8[-]hour workday" and that he should lift occasionally no more than 50 pounds and frequently no more than 25 pounds. (R. 284.) Based on his determination of Kyle's RFC, Dr. Spetzler opined that Kyle was not disabled under the terms of the Act. (R. 291.)

As it related to Kyle's mental impairments, Dr. Luck opined that, although Kyle has a history of polysubstance abuse, he reports that he is independent in his activities of daily living ("ADLs"). He also noted that his behavior is normal, his eye contact is appropriate, his thought process is normal, his affect is euthymic, and his memory is intact. Finally, Dr. Luck found that Kyle performed simple math and spelled "world" forwards and backwards. (R. 288.) Based on these findings, Dr. Luck found that Kyle did not have limitations in understanding and memory, but had limitations in the following areas: concentration and persistence, social interaction, and adaptation. (R. 287–89.) Specifically, as for his concentration and persistence, Dr. Luck found that Kyle was moderately limited in his abilities to maintain attention and concentration for extended periods, perform activities within a schedule, and complete a normal workday and workweek without interruptions from psychologically based symptoms. (R. 287.) As for his social interaction, Dr. Luck found that Kule was moderately limited in his abilities to accept instructions and respond appropriately to criticism from supervisors. (R. 288.) Finally, as for his adaptability, Dr. Luck found that Kyle was moderately limited in his ability to respond appropriately to changes in the work setting. (R. 289.) Dr. Luck concluded that Kyle was not significantly limited in numerous other aspects, such as the ability to make simple work-related decisions, to interact appropriately with the general public and with co-workers, and to travel in unfamiliar places, among others. (R. 287–89.)

Kyle appealed and, on reconsideration, state-agency examiners William Rutherford, Jr., M.D., and Eric Oritt, Ph.D., opined that Kyle suffered several severe impairments—specifically depressive, bipolar, and related disorders; disorders of the skeletal spine; personality disorders; anxiety and obsessive-compulsive disorders; and trauma- and stressor-related disorders. (R. 298.) Dr. Rutherford noted that Kyle's reported symptoms of pain, loss of sensation, weakness, understanding and memory-related symptoms, sustained concentration and persistence-related symptoms, social interaction-related symptoms, and ability to adapt-related symptoms "appear to be partially credible." (R. 300.) Specifically, the severity of the symptoms and alleged impacts on Kyle's functions "are not entirely consistent with the total medical and non-medical evidence, including statements by the claimant and others, observations regarding ADLs, and alterations of usual behavior or habits." (*Id.*) Dr. Rutherford opined that Kyle had the RFC to perform "light" work and, due to Kyle's back pain, he imposed more postural and environmental limitations than Dr. Spetzler did. (R. 301–02.) Specifically, Dr. Rutherford found that Kyle is limited to occasionally—rather than frequently—climbing ladders, ropes, and scaffolds; stooping; kneeling; crouching; and crawling; and that he should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (*Id.*) Dr. Rutherford also found that Dr. Slosman's medical opinion was consistent with the other evidence and with the RFC he imposed on Kyle, noting that she did not impose more restrictions than he did in his findings. (R. 300–01.)

As for his mental limitations, Dr. Oritt noted that Kyle had one psychiatric hospitalization when he was 16, but although he recently started back with psychiatric treatment, he has denied counseling. (R. 304.) Additionally, Dr. Oritt noted that Kyle reported

issues with getting along with others, but that he hangs out with a friend and is now working part time. Dr. Oritt stated that it appears that Kyle's medication is working because he is not feeling as depressed and was having no real anger outbursts. (*Id.*) Dr. Oritt concluded that Kyle had moderate limitations in all of the functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting and managing oneself. (R. 299.) Dr. Oritt first opined that, despite Kyle's depression, anxiety, PTSD, and explosive disorder, he should be able to understand and remember short and simple instructions, and found that he is moderately limited only in the ability to understand and remember detailed instructions. (R. 302.) Dr. Oritt opined that Kyle should be able to work with limited contact with others and that he is moderately limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers without distracting them. (R. 303.) Dr. Oritt also opined that Kyle should be able to follow one- to two-step instructions and that he is moderately limited in his abilities to carry out detailed instruction, maintain attention and concentration for extended periods, and work in coordination or in proximity to others without being distracted. (*Id.*) Finally, Dr. Oritt opined that Kule should be able to work in a static environment and that he is moderately limited only in his ability to respond appropriately to changes in the work setting. Dr. Oritt concluded that Kyle is capable of simple, unskilled work. (R. 304.)

**D.    Relevant Testimony**

In a function report submitted in support of his application, Kyle averred that he lacks concentration, is unable to focus on tasks or lift any weight, cannot bend over or stand for

any length of time, and cannot sit in a chair for more than ten minutes. (R. 573.) He stated that he walks his dogs when his back allows him to (otherwise his mother walks them) and his mother feeds his dogs. (R. 574.) In addition, he stated that he is able to mow his lawn but has to stop constantly to stretch. (R. 575.) Finally, Kyle stated that he lost all interest in his art due to his severe depression, does not get along with authority figures, cannot handle stress or changes in routine, and is bipolar and hears voices in his head all the time. (R. 577–79.)

At a hearing before the ALJ following remand, Kyle testified that he has trouble with his balance due to his vestibular dysfunction and his brain tumor, which requires him to hold onto furniture or the walls when he walks (and, if there is no furniture or wall nearby, he falls). (R. 210.) He stated that he loses his balance and falls multiple times a day. (*Id.*) Additionally, Kyle testified that he gets irritated and angry easily and stays away from people due to his anger issues and depression. (R. 211–12.) Kyle also testified that he has constant neck pain that radiates down his back, as well as tingling in his arms, which causes him to have difficulties picking things up. (R. 214.) Kyle then described his traumatic brain injury, which has impacted his memory and ability to speak, and his right leg pain and intermittent swelling, which impacts his ability to stay seated and standing in one position. (R. 215–19.) Finally, Kyle claimed that he has trouble concentrating to the point where he cannot watch TV or do any chores around the house and has trouble finishing drawings. (R. 222–23.)

A vocational expert also testified and opined that, given the hypotheticals and limitations posed by the ALJ, Kyle could not perform his past relevant work as a landscape laborer because that work requires at least occasional balancing and was inconsistent with the "[n]ever balancing" limitation provided by the ALJ in his hypothetical. (R. 228–29.) She opined

- 15 -

that Kyle could instead perform various jobs at the light exertional level, such as garment sorter, classifier, and electrical accessories assembler. (R. 229.) The vocational expert stated that Kyle could perform that work if the ALJ added additional limitations of never interacting with the public and standing and walking four hours in an eight-hour workday. But he noted that Kyle could not perform those jobs if he was unable to maintain concentration, persistence or pace on work tasks, and that Kyle would occasionally be unable to interact appropriately with supervisors and coworkers. He also acknowledged that Kyle would be off-task 20% of the time during the workday and absent for work two or more days per month. (R. 230.) On cross examination, Kyle's counsel added several limitations to the hypotheticals posed by the ALJ: the inability to accept instructions from supervisors and accept any routine changes that occur in the work environment. (R. 231.) The vocational expert answered that both hypotheticals would preclude all work. (*Id.*)

## E.    The ALJ's Opinion

In the operative decision, the ALJ concluded that Kyle suffered from: "brain tumor-right-sided vestibular schwannoma, traumatic brain injury-left temporoparietal subarachnoid hemorrhage lest posterior subdural hematoma, cervical and lumbar degenerative disc disease, cervical radiculopathy, cervical stenosis, and cervicalgia, major depressive disorder, bipolar, anxiety, post-traumatic amnesia, intermittent explosive disorder, post-traumatic stress disorder (PTSD), history of sexual abuse in childhood, and substance abuse (stimulant use disorder, opiate use disorder, and hallucinogenic use disorder)."[1] (R. 141.) He found that Kyle did not

---

[1] The ALJ also determined that Kyle's epididymitis and orchitis (testicle inflammation) were medically determinable impairments, but that they were not severe enough to render him disabled. (R. 141.) Kyle does not challenge this determination.

suffer from "an impairment or combination of impairments" that met or medically equaled

one of the listed impairments in the applicable regulations. (*Id.*) "After careful consideration

of the entire record," the ALJ found that Kyle had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except
> standing and walking four hours in an 8-hour workday; frequent
> reaching, handling, fingering, feeling with bilateral upper
> extremities; occasional stooping, kneeling, crouching, crawling,
> and climbing on ramps and stairs, but never climbing on ladders,
> ropes or scaffolds, never balancing; frequently operating a motor
> vehicle; never exposure to vibration and hazards, such as
> unprotected heights and dangerous moving mechanical parts;
> moderate noise; limited to understanding, remembering, and
> applying simple instructions; limited to occasional interaction
> with supervisors, coworkers but never public interaction; is able
> to carry out detailed but uninvolved instructions to perform
> simple, routine tasks but not at a production rate pace (such as
> assembly line work); limited to simple work related decisions with
> occasional changes in a routine work setting.

(R. 146.) As a result, the ALJ found that Kyle is unable to perform his past relevant work as a

landscaper laborer because the demands of that type of job exceed his RFC. (R. 156–57.) After

considering Kyle's age, education, work experience, and RFC, however, the ALJ concluded

that a significant number of jobs exist in the national economy that Kyle can perform, such as

a garment sorter, classifier, and electrical accessories assembler. (R. 34.) Therefore, the ALJ

determined that Kyle was not under a disability from June 22, 2020, through the date of his

decision. (R. 158.)

### III.   ANALYSIS

Kyle challenges the ALJ's opinion on three grounds. First, he contends that the ALJ's

assessment of his mental impairments "is not supported by substantial evidence[;]" namely,

that the ALJ failed to properly assess the opinions of Dr. Slosman, Dr. Oritt, and Dr. Luck

and explain why he did not adopt their more restrictive recommendations for Kyle's RFC, and that the ALJ failed to discuss Kyle's ability to perform work activities for a full workday despite his moderate limitations in concentrating, persisting, and maintaining pace. (Pl.'s Br. at 21–25.) Second, Kyle argues that the ALJ's assessment of his physical impairments and RFC findings "are not supported by substantial evidence[;]" namely, that the ALJ failed to include additional limitations in Kyle's RFC despite finding that his impairments warranted greater limitations than those recommended by the medical examiners, and that the ALJ failed to make specific findings regarding Kyle's ability to perform work activities for a full workday despite his pain, fatigue, need to abandon tasks, and the need to lie down during the day. (*Id.* at 28–29.) Third, Kyle contends that the ALJ's decision finding his allegations inconsistent with the medical evidence "is not supported by substantial evidence and should be rejected as insufficient." (*Id.* at 32.) Because this court finds the ALJ's analysis of the medical opinions regarding Kyle's mental impairments was insufficient and is thus a basis for remand, it will not reach Kyle's other arguments.

"The regulations specify how ALJs consider medical opinions as part of their disability determinations and how ALJs articulate' certain findings in their written decisions." *Ashley D. v. O'Malley*, No. 5:22-cv-00050, 2024 WL 278911, at *5 (W.D. Va. Jan. 25, 2024) (cleaned up). An ALJ will not defer to any medical opinion in a claimant's record; rather, the ALJ will consider all medical opinions and articulate how persuasive they find those opinions. *Id.* (citing 20 C.F.R. §§ 404.1520c(a), 416.920c(a)). An ALJ must "'articulate how [he] considered the medical opinions from [each] medical source' on a source-by-source basis[,]" but he need not articulate how he "considered each medical opinion . . . from one medical source individually,"

*Id.* (citing 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1)). "[W]hen determining the persuasiveness of medical opinions,[2] an ALJ must consider the following factors: (1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like a physician's familiarity with the evidentiary record or their understanding of the SSA's policies and evidentiary requirements." *Oakes v. Kijakazi*, 70 F.4th 207, 212 (4th Cir. 2023) (citing 20 C.F.R. § 404.1520c(c)(1)–(5)). Supportability and consistency are the most important factors in an ALJ's determination of a medical opinion's persuasiveness and, as a result, the ALJ must address those two factors in his evaluation. 20 C.F.R. § 404.1520c(b)(2). "Supportability is the degree to which a provider supports their opinion with relevant, objective medical evidence and explanation, and consistency is the degree to which a provider's opinion is consistent with the evidence of other medical and non-medical sources in the record." *Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(2)). The ALJ's decision "must build an accurate and 'logical bridge between the evidence and the ALJ's conclusion that a medical opinion' is or is not 'persuasive' evidence of the claimant's allegedly disabling medical condition[.]" *Sharrie B. v. Kijakazi*, No. 5:22-cv-00007, 2023 WL 8905206, at *5 (W.D. Va. Dec. 27, 2023) (quoting *Oakes*, 70 F.4th at 212–14).

The ALJ concluded that Dr. Luck's and Dr. Oritt's respective opinions that Kyle could perform simple tasks were not persuasive. The ALJ's analysis of both opinions was identical. Specifically, he stated that the opinions were

---

[2] As used in this context, a "medical opinion" is a statement from a medical source about what a claimant can still do despite his impairments and whether the claimant has restrictions in his ability to perform physical and mental demands of work activities as well as his ability to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2)(i).

> not consistent with or supported by the longitudinal record showing generally normal mental status exams, other than variations in his mood, and noting that [Kyle] was fully alert and oriented and able to follow multi-step command or [Kyle's] reported activities of daily living, which shows that he engages in many multi-step tasks and activities, including taking care of his dogs, independently performing his activities of daily living, drawing and working on commissioned portraits, and camping[.]

(R. 154, 155.) The ALJ made a similar conclusion regarding Dr. Slosman's opinion that Kyle likely struggled to take instruction from supervisors and get along with peers, and that his ability to maintain regular attendance at work and perform work activities on a consistent basis would likely be negatively impacted by his intermittent explosive disorder and GAD. (R. 155.) The ALJ stated that this opinion was not persuasive

> as it appears to be based . . . heavily on [Kyle's] subjective complaints, particularly at that time and not supported with the clinical findings on Dr. Slosman's exam nor consistent with the relatively normal mental status examinations of the record and conservative mental health treatment. Furthermore, her opinions are rather vague and not defined in occupational terms.

(R. 155.)

The ALJ's assessment of each of these doctors' opinions was insufficient and is not supported by substantial evidence. First, by regurgitating the same analysis as to the persuasiveness of Dr. Luck's and Dr. Oritt's opinions, the ALJ failed to conduct a source-by-source assessment. *See Sullivan v. Kijakazi*, No. 5:20-cv-569, 2022 WL 880030, at *6 (E.D.N.C. Feb. 28, 2022) ("To the extent that the ALJ does attempt to rely on 'the foregoing reasons' in discrediting Ms. Youngblood's opinions, it is unclear what evidence the ALJ used to find Ms. Youngblood's opinions unsupported or inconsistent, precluding meaningful review by the

court. Further, it is unclear how referring to 'the foregoing reasons' can satisfy the ALJ's obligation to explain the 'supportability' of Ms. Youngblood's opinions.").

Even if the identical analyses qualified as source-by-source assessments, they are deficient. Although the ALJ noted the supportability and consistency factors, he improperly conflated and combined his analysis of the two factors. *See Derek L. v. Kijakazi*, No. 3:20-cv-00070, 2022 WL 636410, at \*6 (W.D. Va. Mar, 3, 2022) ("[T]he ALJ must articulate how he or she considered each of [the supportability and consistency] factors in determining persuasiveness for all medical opinions in the claimant's record.").

In addition, though the ALJ's discussion pointed to normal mental status exams and Kyle's ability to perform activities of daily living and pursue some hobbies, he did not support these findings with specific citations to either doctor's explanation of their medical opinions (required for the supportability analysis) or to the medical record (required for the consistency analysis) in concluding that the opinions were not persuasive as to Kyle's ability to complete complex tasks. *Contrast Anthony H. v. Kijakazi*, No. 3:21-cv-00015, 2022 WL 2964807, at \*6 (W.D. Va. July 27, 2022) (noting that the ALJ did not mention the doctor's supporting explanation nor articulate how it impacted the opinion's persuasiveness), *and Derek L.*, 2022 WL 636410, at \*7 ("[The ALJ] did not identify any specific examinations or specific findings that he found 'not consistent' with Dr. Johnson's opinion"), *with Lasharne W. v. Comm'r, Soc. Sec. Admin.*, No. SAG-21-2603, 2023 WL 2414497, at \*2 (D. Md. Mar. 8, 2023) (declining to remand where the ALJ cited specific treatment notes to support his conclusions). Moreover, it is unclear whether the ALJ considered the limited extent to which Kyle testified that he could perform these activities and how he factored that into his assessment of the consistency

of Dr. Luck's and Dr. Oritt's opinions. *See Derek L.*, 2022 WL 636410, at *7 (highlighting the "critical differences between activities of daily living and activities in a full-time job"); *see also* R. 705 (reporting that he has little interest or pleasure in doing things and has very little energy); R. 761–62 (reporting that he tends to stay home all the time and needs help with certain daily tasks like getting groceries); R. 1178 (reporting issues concentrating on portrait commissions); R. 222–23 (testifying that he does not do any chores around the house.

The ALJ's assessment of Dr. Slosman's opinion is likewise deficient for the failure to cite specific parts of Dr. Slosman's clinical findings that do not support that opinion or evidence from the medical record that is inconsistent with her opinion. In addition, an ALJ cannot "discount a medical opinion solely because it supports its findings with a claimant's subjective reports." *Scarlette v. Kijakazi*, No. 4:22-cv-123, 2023 WL 5193879, at *3 (E.D.N.C. July 25, 2023) (citing *Oakes*, 70 F.4th at 213). The ALJ's "conclusory observation" here that Dr. Slosman relied too much on Kyle's subjective reports regarding his mental health "is not helpful, for '[m]ental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of [her] professional expertise' and 'the trained physician, not the ALJ, is better positioned to discern 'true' complaints from exaggerated ones.'" *Linger v. Comm'r of Soc. Sec.*, No. 22-2192, 2025 WL 40548, at *6 (4th Cir. Jan. 7, 2025) (quoting *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019)) (first alteration in original); *see also Edwin M. v. Saul*, No. 4:19-cv-00046, 2021 WL 1565415, at *10 (W.D. Va. Apr. 21, 2021) ("But mental health conditions are often diagnosed based on subjective reports and are not as susceptible to objective observation as physical conditions may be."). Because the ALJ did not support his conclusions that the medical opinions were

unpersuasive as to Kyle's ability to complete complex tasks with specific evidence from the record, the court is "left to guess" as to how the ALJ reached his evaluation of the medical opinions in light of the evidence of record and therefore cannot review the reasonableness of his conclusions. *See Sharrie B.*, 2023 WL 8905206, at \*9. Remand is therefore required.

## IV. CONCLUSION

For the foregoing reasons, the court will remand this matter to the Commissioner for further proceedings consistent with this Opinion.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 17th day of March, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE